HARRY DANIELS *et al. vs.* SARAH AHARONIAN *et al.*

JULY 24, 1939.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

Moss, J. This cause is now before us on the appeal of the complainant Harry Daniels from a final decree of the superior court dismissing the bill of complaint. The bill was brought by him and Elizabeth Jundanian against Sarah Aharonian, individually and as executrix of the will of Mariam Danelian, alias Daniels, deceased, Pilazzon Danelian, alias Pilo Daniels, Ogaper Hogopian and Arshaloose Wahl. These parties are the only son and all the daughters of Zakar Danelian, alias Daniels, deceased, and the above-mentioned Mariam Danelian.

Among the main allegations of the bill are, in substance, that under and in accordance with an oral agreement between Zakar and Mariam Danelian he made a will on June 30, 1930, in which, except for one dollar given to each of their children, he gave to her all his real and personal property, amounting to about $20,000 net, and named the complainant as executor; that under and in accordance with the same agreement and in consideration of the making of this will by him, she on the same date made a will by which she gave five dollars to Arshaloose Wahl and all the rest of her estate and property to her other children as follows: To Harry Daniels 30%, to Pilazzon Danelian 25%, and to each of the other three daughters 15%, and named the complainant as executor; that she then had no property, except such interest as she may have had in a bank account, which had been created by the deposit of money belonging to her husband alone and which was payable to either or to the survivor of them; that Zakar Danelian died on December 11, 1931; and that under his above will, duly probated, his wife Mariam received all his net estate, then valued at about $20,000.

The other main allegations of the bill are, in substance, that on December 21, 1934, she conveyed to her daughter

Pilo Daniels, without valuable consideration received therefor, the home real estate, which she had received under the will of Zakar Danelian; that on October 3, 1935, she executed a will giving all her property equally to all her children, except the complainant Harry Daniels, to whom she gave nothing, and naming Sarah Aharonian as executrix; that she died on October 17, 1935, leaving almost no property except what she had received, directly or indirectly, under the will of Zakar Danelian; and that the above-mentioned conveyance to Pilo Daniels, the revocation of her will of June 30, 1930 and the making of her will of October 3, 1935 were all in violation of the above-mentioned agreement with Zakar Danelian.

The main prayers for permanent relief in the bill are, in substance and effect, that the agreement above mentioned be specifically enforced; that a trust may be impressed upon all the property held, owned or possessed by Mariam Danelian in accordance with the wills of June 30, 1930; that a new trustee in place of Mariam Danelian, deceased, be appointed to take title to all the trust property and distribute the same in accordance with the order of the court; and that Pilo Daniels may be permanently enjoined from alienating or encumbering the real estate conveyed to her by her mother as above stated.

The respondents in their answer neither admit nor deny any of the allegations of the bill, above stated, and set up no matter of affirmative defense.

The cause was previously before us on the appeal of the complainants from a decree of the superior court dismissing the bill, upon a motion made by one of the respondents at the conclusion of the evidence for the complainants and based upon the contention that such evidence did not prove that the complainants were entitled to any of the relief prayed for. That appeal was sustained by us on the ground that the decree appealed from had been entered prematurely,

because the respondents had not closed their case. The cause was therefore remanded to the superior court for completion of the evidence. *Daniels* v. *Aharonian*, 61 R. I. 311, 200 A. 957.

When the cause came on for further hearing in that court, Elizabeth Jundanian, one of the original complainants, was allowed by the court, at her request, to withdraw as a party complainant. Evidence was then introduced for the respondents and evidence in rebuttal for the complainant.

It is not in dispute between the contesting parties that the evidence, thus introduced, clearly proved all the above-summarized allegations of the bill of complaint except the allegations that the two wills of June 30, 1930 were made under and in accordance with an oral agreement between Zakar and Mariam Danelian, the making of her will being in consideration of the making of his; that the conveyance of the home property by Mariam Danelian to Pilo Daniels was without valuable consideration; and that this conveyance and the revocation by Mariam Danelian of her will of June 30, 1930 and the making of her will of October 3, 1935 were all in violation of the above agreement. These excepted allegations remained in dispute.

At the close of the final hearing, the justice before whom it had been held made a decision in which he applied the rule that in such a case, of an alleged contract to make a will, proof of the strongest character is required, and then found from the evidence that Mariam Danelian on June 30, 1930 "went through the form of agreeing with her husband" to make the will which she did make on that day. But he also found from the evidence that she objected to that will and only executed it as the result of coercion and undue influence by her husband; and that there was therefore not "a true consensual contract made between the parties."

On the ground that the complainant is a volunteer and parted with nothing under the alleged contract, the trial justice refused to apply the well-known rule that in order for one party to be in a position to rescind a contract such party must return the consideration received and put the other party *in statu quo*. He therefore held that the respondents were in a position to take advantage of the defence of undue influence and that this was decisive in their favor.

He also found that the property which Mariam Danelian conveyed to Pilo Daniels was conveyed in consideration of advances of money to a substantial amount which the grantee had made to the grantor, and that there was no testimony that the grantee knew or had any reasonable notice of the agreement. The conclusion of his decision was that the case did not "appeal to the equity or conscience of chancery in favor of the complainant" and that therefore a decree should be entered for the respondents. The decree appealed from, dismissing the bill, was entered accordingly.

Postponing, for later consideration in this opinion, the matter of coercion or undue influence, we are of the opinion that the finding of the trial justice to the effect that Mariam Danelian agreed with her husband to make the will which she did make on June 30, 1930, was amply supported by the evidence in this cause. The main gist of this agreement, on her part, was that if her husband would execute the will prepared for him by which he would give all his property to her, except one dollar to each of their children, she would execute the will prepared for her, by which she would give all her property as set forth in that will.

It is obvious from undisputed facts as to their respective property holdings and from the wills themselves that the wills were designed to cover only the contingency that he would predecease her, and that substantially all the property which was to be disposed of by *her* will would be prop-

erty which she would receive under *his* will. The problems which have frequently arisen, where wills have thus been made by agreement between testators, have been generally discussed, often at great length, under the head of joint or mutual wills; and the law applicable thereto has become reasonably well settled.

One problem as to which there is no general concurrence among the authorities is whether an agreement between two persons for the disposition of their respective properties on their respective deaths can be inferred from the facts that the wills were made at or approximately at the same time and that they contained mutual provisions. But that problem is not before us, as there was ample, uncontradicted evidence, outside of the wills themselves and of the testimony of the complainant, that they were made by Zakar Danelian and his wife respectively under and in pursuance of an oral agreement between them.

One of the witnesses to the wills, apparently entirely disinterested, testified that after the wills, all prepared, had been read to Zakar Danelian and his wife and had been translated to her, the husband said to her: "I will give you all my possessions, provided you make a will making the following divisions of real and personal property."; and that he then stated to her the percentages to the different children as given in her will. This witness testified further that she made no objection to this, except that she said that she wanted their daughter Arshaloose, who was given only five dollars, to get a real share of the estate and not be left out; but that the husband said that this was his wish, that she be left out; and that the wife finally agreed and then both wills were signed, his being signed first.

This testimony was not contradicted by any other witness and was in entire harmony with the provisions of the two wills. The testimony of the complainant was to the same effect, that the father said, in the Armenian tongue

of course: "If you do not agree to that I would not turn, give it to you that way. This is the only way I will give it to you if you accept it as I have outlined." The complainant in his testimony continued: "Well, she objected and cried over it, and finally agreed to it. After that he signed his will."

Even if this testimony of the complainant be entirely ignored, the uncontradicted testimony of the other witness on the subject, taken in connection with the signing of the two wills very soon after the conversation testified to and with the provisions contained in them, amply supports the finding of the trial justice that a contract was entered into, and shows what the contract was. It satisfies all the requirements, stated in the authorities on the subject, for a contract which should be enforced in equity by imposing a trust upon the surviving party to dispose, in accordance with the agreement, of the property covered thereby, provided, of course that the party first dying has performed the agreement on his part.

This case is a particularly clear one for the enforcement of such a trust, because the husband fully performed his part of the agreement by leaving substantially all his property to his widow, just as the agreement provided, and substantially *all* the property which his widow had after his death was property which she had thus received from him.

It is also a part of the well-settled doctrine, applicable to cases like the present one, that the trust, created by the agreement and taking effect upon the death of the party first dying, can be enforced, as to his or their interests thereunder, by any of the persons for whose benefit, after the death of the surviving party, the agreement was made. Even in New York, where the doctrine of *Lawrence* v. *Fox*, 20 N. Y. 268, prevents the full application of the above doctrine, it is held that a son or other near relative of the promisee, *i.e.*, of the party first dying, can thus enforce the agree-

ment against the property of the promisor or surviving party. *Seaver* v. *Ransom,* 224 N. Y. 233, 120 N. E. 639. It is well settled that if a trust as to a certain *res* is created by a party or parties for the benefit of another person, that other person can enforce the trust so far as created for his benefit.

· The following are some of the many authorities which support the above rules stated as applicable to cases like the present one. *Baker* v. *Syfritt,* 147 Ia. 49, 125 N. W. 998; *Meador* v. *Manlove,* 97 Kan. 706, 156 P. 731; *Stevens* v. *Myers,* 91 Or. 114, 177 P. 37; *Seaver* v. *Ransom,* 224 N. Y. 233, 120 N. E. 639; *Tooker* v. *Vreeland,* 92 N. J. Eq. 340, 112 A. 665; *Lewis* v. *Lewis,* 104 Kan. 269, 178 P. 421; *Canada* v. *Ihmsen,* 33 Wyo. 439, 240 P. 927; Note in 2 A. L. R. 1193, at 1200 and cases discussed; 1 Schouler on Wills etc., 6th ed., 809, §711; 1 Alexander on Wills, §§87, 88, 98, 100. See also *Spencer* v. *Spencer,* 25 R. I. 239, 55 A. 637, for general rule as to enforcement in equity of oral contract, for valuable consideration furnished, to leave property in a certain way by will.

In *Stevens* v. *Myers, supra,* it was held that one maker of mutual wills, executed in accordance with an agreement based on a valuable consideration, cannot, after probating, and receiving property under, the will of the other party to the agreement, who dies while both wills are in force and effect, abandon his part of the agreement and dispose of his property in violation of its terms. The opinion contains a very good citation and discussion of many cases and statements by text-writers.

In *Canada* v. *Ihmsen, supra,* at page 452 (931), the court says, as to mutual wills made by agreement between the testators: "So, too, as we have heretofore noted, where one of the parties to the contract dies leaving his will in force and effect, and the other party enjoys the benefit thereof, it would be clearly unjust to permit the survivor to break

his agreement and such is the unanimous holding of the courts."

Moreover, if that part of the agreement which binds the surviving party contains no provision defining such party's powers over the whole property during the survivorship, but only provides that he shall by will dispose of his property at his death to certain beneficiaries in a certain way, then it seems to be well settled that he holds all the property subject to a trust to carry out the agreement, but may use not only the income but reasonable portions of the principal for his support and for ordinary expenditures, and may change the form of it by reinvestment and the like, but must not give away any considerable portions of it or do anything else with it that would be inconsistent with the spirit or the obvious intent and purpose of the agreement. *Carmichael* v. *Carmichael,* 72 Mich. 76, 40 N. W. 173; *Campbell* v. *Dunkelberger,* 172 Ia. 385, 153 N. W. 56; *Bower* v. *Daniel,* 198 Mo. 289, 95 S. W. 347.

In the instant case substantially all the property of the wife after her husband's death came to her by his will, and in our opinion she was equitably bound to hold it, during the rest of her life, subject to the above-stated limitations.

In the instant case the complainant, after the death of his father, Zakar Danelian, and the settlement of the estate, made an agreement with his mother, dated November 14, 1932, by which he bought from her the stock in trade and other assets of a retail business, which his father owned at the time of his death but of which the son had had the active management for some years, the father being blind. These assets had passed to her as a part of the estate and she executed a bill of sale to the complainant, with a warranty of title. By this agreement he indemnified her against the liabilities of the business and agreed to pay in various ways $6200, partly within a short time and partly by installments over a considerable period.

At the time when his mother conveyed the home real estate to her daughter Pilo, he was indebted to the mother $3000 or thereabouts under the above agreement. Learning of her conveyance of the home real estate, he objected to it and refused to pay any more under his agreement with his mother, unless she procured a reconveyance to her of that real estate. He testified that he did this because he insisted that the conveyance was in violation of the agreement between his father and mother as to their wills. Later she brought an action at law against him, which is still pending, to recover the balance still due her under the agreement for the sale of the business assets.

The respondents' counsel contend that this agreement was unfair to the mother, because the price was too low, but according to the evidence it appears to have been a fair price, when the fact that he assumed the debts of the business is taken into consideration. The same counsel also contend vigorously that the purchase of these assets by him from her and especially the warranty of title by her which he caused to be put into the bill of sale were utterly inconsistent with his contention that she was bound by the agreement with her husband to dispose, in accordance therewith, of the property which she had received under the husband's will.

But by reason of her powers over this property during her survivorship, according to the law governing the subject of mutual wills above discussed, we cannot see that there was any such inconsistency. The agreement and the trust resulting therefrom upon the receipt by her of her husband's property, on his death, did not make it her duty to keep that property in the same form as when she received it. Therefore we cannot see that their son was estopped, by his conduct as to the store assets, to insist upon his rights under the agreement between his parents.

The trial justice found, in his final decision, that the conveyance by the mother to her daughter Pilo of the home real estate was upon a valuable consideration which the daughter had paid in good faith and without knowledge of the agreement between her father and mother. But the daughter's own testimony showed conclusively, in our opinion, that the substantial amounts which she paid for her mother's benefit were not paid for that conveyance, but were paid wholly because of her love for her mother and to make her mother comfortable and happy, and not because of any expectation of repayment in any form.

The nearest that she came to testifying to facts in support of a contention that the conveyance was for a valuable consideration was that she testified, referring to her mother and a time shortly before the deed was made: "She had told me that she needed me to take care of her and the expenses and she would take care of me", and that her mother mentioned the house. Then Pilo testified as follows: "She said, 'I need your help at this time.' She said, 'Your brother has a duty toward me. If you do all these things for me I intend to protect you and your future.' I was doing these things anyway, but that is the way she put it. I would have done them anyhow." She testified that she paid her mother no money when she got the deed.

She testified also that she paid all the living expenses during the years 1933 and 1934 and received the deed on December 21, 1934. She could give no estimate of what she had thus spent and it should be remembered that she lived with her mother in the home property. After her mother's death in the fall of 1935, she herself took possession of the property and let one of her sisters and the sister's husband come and live there, and received twenty dollars per month from them as rent. The value of this property was about $6000.

She also testified that she was reluctant to take the deed from her mother because her brother had insisted "right along" that the wills (evidently referring to the wills that her father and mother had made at the same time) had to be carried out as they were originally written, and she knew that he would object to the conveyance of this property to her. She testified that after her father's death she saw his will and a copy of her mother's will that was executed at the same time as his will and, inferentially at least, admitted that she knew their contents.

It is possible that she may have some claim against her mother's estate by reason of these expenditures, which appear to have been far below the value of the property conveyed to her. But, in our opinion, the finding of the trial justice that she was a *bona fide* purchaser of this property for a valuable consideration is clearly not supported by the evidence. This being so, we are also of the opinion that according to the law which we have above discussed as governing the powers of the surviving party, under an agreement such as we have before us, in dealing with the property received in accordance with the agreement, the mother had no right to give away any large part of that property or even dispose of it for a clearly inadequate consideration.

That would be in clear violation of the intent and purpose of the agreement and of the trust which resulted from her receipt of the property in accordance with the agreement. We are therefore of the opinion that the complainant is entitled to enforce this trust upon the net trust estate, to the extent of the 30% of it which he was to receive under his mother's will that was executed in accordance with the agreement.

This leaves for consideration only the two reserved questions. One of these is whether the trial justice was justified by the evidence in finding that the agreement, which he found was *in fact* made by the wife with her husband,

was not enforceable against her because her consent to it was obtained by coercion and undue influence exerted over her by him. The other is whether the complainant had the right to rely on the contention that, even if the wife was coerced or unduly influenced to make the agreement, she could not repudiate it after the husband had fully performed his part of it and she had received and enjoyed the full benefit of his performance of it, which was a substantial benefit to her.

As to the first of these questions, we find that the furthest that the evidence went in the direction of showing coercion or undue influence was that there was evidence that the wife, when informed of the contents of the will which he asked her to sign, was satisfied with it except that she objected strongly to one provision in it, namely, that their daughter Arshaloose Wahl would be given only five dollars under it; that her husband told her that he wanted that provision in the will and that he would not give his wife all his property by *his* will, unless that provision was in *her* will; and that she cried, but when he would not give way, she consented to sign her will as drawn, if he would sign his as drawn.

In our judgment this fails entirely to show coercion or undue influence. In what the husband said and did there was nothing that in our judgment resembled the exercise of undue influence; and as to coercion, there was nothing that indicated that he did anything except give her a choice between two alternatives.

Virtually *all* the property involved belonged to him alone and, except for her dower interest in the real estate, he could dispose of it as he pleased in his lifetime. Except for the same interest and a minor allowance for support which she had a legal right to have from his estate for a short time, he had a right to dispose of all this property by will, without regard to her welfare or wishes. One of the alternatives

that he offered her was to have his wishes as to the disposition of *his* property carried out by the plan of *mutual wills,* in a way that would give her much more than a simple life estate. The other was to leave him free to accomplish the same result or a result less favorable to her, by means of *his will alone.*

He threatened nothing except not to execute his will as drawn, which he was in no way bound to execute, and she merely did what any wife might do under the circumstances. Therefore we are of the opinion that the trial justice was clearly wrong in finding that the agreement in question was invalid for coercion or undue influence.

Moreover, the wife in this case made no effort to rescind the agreement in her husband's lifetime; and upon his death she accepted the legal ownership of all his net estate, which he had given her in accordance with *his* part of the agreement and in consideration of her agreement to perform *her* part; and then she later attempted to act in a manner clearly inconsistent with her part of the agreement. It is clear to our minds that equity would not permit her thus to repudiate her part of the agreement after accepting and continuing to enjoy the full benefit of his part of the same agreement, even if she had entered into the agreement by reason of coercion or undue influence exercised upon her by him.

The trial justice found, in effect, that even though the wife had, by accepting the full benefit of the agreement after her husband's death, estopped herself from repudiating the duties which she had assumed under the agreement, yet the complainant, because he had furnished no part of the consideration for her promise, could not, by proceedings in equity, get the benefit of that which she had agreed with her husband to do for the complainant's benefit.

What seems to us the most obvious answer to this finding, and one that seems to us conclusive, is based on the settled equitable doctrine which applies to cases of mutual wills made by agreement between two testators and which we believe has been applied in every case where the survivor of the testators has agreed to dispose by will in a certain way of property that he or she may receive, under the agreement, from the other testator.

This doctrine is that the survivor received such property subject to an enforceable trust for the benefit of the persons to whom he or she had agreed to give the property by will; and that any of these persons, as *cestui que trust,* can, like any other *cestui que trust,* enforce such part of the trust as is for his benefit and can do so whether or not he has furnished any consideration for the trust.

Therefore we cannot see that it makes any difference in the instant case that the complainant furnished no part of the consideration received by his mother for the obligations assumed by her under the agreement between her and her husband. Our conclusion, then, is that the complainant is entitled to enforce the agreement between his father and mother, as to their wills, to the extent of his own interest thereunder; that the conveyance of the family home real estate from his mother to his sister Pilo was invalid as against him; and that he is entitled to receive from the property and assets belonging to his mother at the time of her death, which for this purpose must be treated as including the home property, what he would have been entitled to receive, if the agreement had been carried out by her in good faith. Of course, what he owes her estate under the agreement between them must be deducted from what he is entitled to receive from her net estate.

The appeal of the complainant is sustained and the decree appealed from is reversed.

298

The parties may, on October 2, 1939, submit to us a form of decree, in accordance with this opinion, to be ordered to be entered in the superior court.

*Cunningham, Semonoff & Kelly, Judah C. Semonoff,* for complainant.

*Arabian & Barad, Aram A. Arabian,* for respondents.